UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CRIMINAL ACTION NO. 3:15-CR-00049-TBR

UNITED STATES OF AMERICA                                   PLAINTIFF

v.

KENYATTA TYRONE JAMES                                   DEFENDANT

**Memorandum Opinion and Order**

This matter is before the Court upon several motions by Defendant Kenyatta James, most notably his motions to suppress and to exclude evidence. [DN 105; DN 102; DN 103.] The United States has responded to those motions, [DN 107; DN 109], and James has replied, [DN 117; DN 115]. The Court held two suppression hearings, on October 17 and December 16, 2016, respectively, receiving testimony from Detective Aaron Browning, Major Kevin Thompson, Detective Chad Stewart, and Crime Scene Unit technician Dona J. Stephenson. Fully briefed, James' substantive motions are ripe for adjudication. James also moves to supplement the record and to strike exhibits introduced by the United States during his first suppression hearing. [DN 168; DN 172; DN 162.]

For the following reasons, James' motions to supplement the record [DN 168; DN 172] are GRANTED. The Court has considered those supplements in reaching its decision herein. His other motions [DN 102; DN 103; DN 105; DN 162] are DENIED.

## I. Facts and Procedural History

This case arises from Defendant Kenyatta James' arrest on May 8, 2015. That evening, Detective Aaron Browning and Major Kevin Thompson of the Louisville Metro Police Department were on patrol in the Russell neighborhood, located in west Louisville.   Both officers testified that, based upon their knowledge and experience, the Russell neighborhood is a high-crime area known for narcotics trafficking and violent crimes.   At about 6:00 p.m., Browning and Thompson were in Browning's maroon Ford Explorer, traveling westbound on Stone Alley between South 19th and South 20th Streets.   Nineteenth and 20th Streets run roughly north to south, with 19th Street located to the east of 20th Street.   Near the 19th Street entrance to Stone Alley, they observed a black Toyota sedan approaching them, traveling eastbound.   Browning observed the vehicle's operator, later identified as Kenyatta James, not wearing a seatbelt.   Browning testified that he made the decision to initiate a traffic stop of the vehicle at this time.   After passing James's vehicle in the alley, Browning then turned his Explorer around in a parking lot and repositioned himself behind James, so that both were facing east at the 19th Street entrance to Stone Alley.   James then made a right turn onto 19th Street without using a turn signal.   Browning and Thompson followed James onto 19th Street.   After traveling south on 19th Street for a half-block, James then turned right onto West Madison Street, which runs parallel to Stone Alley.   Once again, James did not use a turn signal.   The officers followed James onto Madison Street, and Browning activated his emergency equipment halfway down the block.

James came to a stop in front of 1939 West Madison, the house nearest to the corner of West Madison and 20th Streets.   Browning approached the driver's side of James' vehicle, and Thompson approached the passenger side.   After Browning asked James for his driver's license, James, still seated, reached with his right hand toward the right side of his body.   Browning testified that at this point, his view of James' right side was obscured, so Browning moved toward the front of James' vehicle to get a better view.   When Browning made this movement, James immediately stopped reaching for his pocket and said, "Don't worry, it's just my cell phone."   Neither officer recalls seeing a cell phone in James' hand at this time. James then produced an Indiana driver's license, but told Browning he lived at 1939 West Madison.   He also told the officers that the car, which had a Kentucky license plate, was registered to his fiancé.

At some point after James produced his license, Browning slid it across the roof of the car to Thompson.   Browning did not recognize James, but Thompson did.   Thompson recalled that several years prior, James' name had been mentioned during internal police department meetings regarding unrelated crimes. Thompson testified that once he recognized James' name, he signaled to Browning that James was known to him as a criminal.   However, Browning stated that he did not realize until after he detained James that Thompson knew of James' criminal history.

Browning testified that at this point, based upon James' statement about the cell phone and the mismatch between James' driver's license, claimed residence,

3

and vehicle registration, he suspected James was involved in criminal activity. Browning asked James whether there were firearms or narcotics in the vehicle. James said no, and declined to give Browning permission to search the vehicle. James also told Browning that he had just been released from prison on narcotics charges.   Browning then asked James to step out of the vehicle.   At first, James refused, stating that it was his Fourth Amendment right to remain inside.   After some discussion between Browning and James, during which Browning explained that *Pennsylvania v. Mimms* entitled Browning to ask James to step out of his car, James agreed to do so.   James was wearing baggy clothing which, in Browning's experience, makes concealing weapons and narcotics easier.   After he exited the vehicle, Browning performed a *Terry* pat-down for weapons on the outer layer of James' clothing, and found a .40 caliber Glock 23 handgun in James's right pants pocket.

After securing James in handcuffs, Browning performed a full search of James' person, finding two small bags of marijuana in his right coin pocket. Officers also found a digital scale in James' vehicle.   During this time, Detective Chad Stewart, who was present at the scene as backup, ran a background check on James.   He discovered that James had an outstanding arrest warrant from Cook County, Illinois.   Browning did not know about James' outstanding warrant at the time he conducted the *Terry* pat-down.   Based upon James' Illinois warrant, his possession of a handgun, and his possession of marijuana, James was arrested and transported to the detention center by Stewart.

4

Browning took the handgun he seized from James' person to the Crime Scene Unit, where it was collected by CSU tech Dona J. Stephenson.   On James' original citation, Browning wrote that he recovered a Glock 23 handgun, .40 caliber, with the serial number "DNX930 U.S."   However, in Stephenson's CSU report, she lists the serial number as "DNX903."   Browning admitted during the suppression hearing that he incorrectly transposed the last two digits of the firearm's serial number on the citation.   The CSU report lists Kenyatta Tyrone James as the suspect, and the property room voucher lists "Commonwealth of Kentucky Society" as the weapon's owner.   Stephenson testified that at the time, it was CSU's standard practice to list "Commonwealth of Kentucky Society" as the owner of all evidence turned into CSU by LMPD officers.   After processing and photographing the weapon, Stephenson turned it in to the property room.   The weapon itself, the CSU report, and the property room voucher were all introduced into evidence at James' evidentiary hearing.

At James' second suppression hearing, Detectives Browning and Stewart provided further testimony regarding James' outstanding Cook County, Illinois arrest warrant.   Specifically, Browning stated that when he asked for James' driver's license, he intended to use it to run a background check on James. Browning estimated that he runs a background check in ninety percent of the traffic stops he conducts, and he could not recall a specific instance in which he had not run a background check.   In a routine stop for a minor traffic offense, Browning testified that he might not perform a warrant check if the driver's personal

information and conduct did not raise any suspicion.   However, when a driver, like James, provides inconsistent information, Browning said that he would always check to see if the driver had any outstanding warrants.

Detective Stewart, meanwhile, explained that one of his regular duties as a backup officer is to conduct a background check at the request of the arresting officer.   He stated that when he arrived on the scene, Major Thompson handed him James' information, and Stewart entered James' information into the computer system in Stewart's vehicle.   Stewart stated that while still at the scene of James' arrest, Stewart's computer indicated that James had an active warrant from Cook County, Illinois in the National Crime Information Center (NCIC) database. Stewart testified that when his computer shows that a suspect has an NCIC warrant, the next step is to have LMPD dispatch contact NCIC to verify that the warrant is still active and that its issuing jurisdiction still wants the warrant to be executed.   Stewart followed this procedure, and LMPD dispatch told Stewart to execute the Cook County warrant.   Once NCIC validated the warrant, Stewart testified that he was required to place James under arrest.

Following his arrest, James was indicted on one charge of possession of a firearm by a convicted felon, 18 U.S.C. § 922(g)(1).   [DN 1 at 1.]   James filed the instant motions, seeking to suppress and exclude from evidence the handgun that Browning took from his person during the *Terry* pat-down search.   *See* [DN 105; DN 102; DN 103.]   The United States has responded to these motions, [DN 107;

DN 109], and James has replied, [DN 117; DN 115].   Fully briefed, James' motions are ripe for adjudication.

## A. James' Motion to Suppress

The United States argues that the weapon seized from James need not be suppressed for two reasons.   First, the government contends that Browning had reasonable suspicion under the totality of the circumstances to believe that James was armed, justifying a pat-down search of James' outer clothing pursuant to *Terry v. Ohio*, 392 U.S. 1, 27 (1968).   Second, the United States proposes that even if the search was not justified by reasonable suspicion, the firearm would have inevitably been discovered because of James' outstanding Cook County, Illinois arrest warrant.   The Court will address each argument, and two threshold motions, in turn.

### (1) *Threshold Issues*

In addition to his motions to suppress and exclude, James also moves to strike the eight exhibits the United States introduced during his first suppression hearing.   [DN 162.]   James contends that those exhibits are inadmissible under Federal Rule of Evidence 104.   The relevant portions of that rule provide that "[t]he court must decide any preliminary question about whether . . . evidence is admissible." Fed. R. Evid. 104(a). Furthermore, "[w]hen the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist."   Fed. R. Evid. 104(b).   James makes his Rule 104 objections in only a conclusory fashion without explaining why Rule 104

bars the admission of the United States' exhibits.  *See generally* [DN 162.] Moreover, James did not object to exhibits 1 – 7 during the suppression hearing, so his objections to those exhibits are waived.   Fed. R. Evid. 103(a)(1); *see United States v. Collins*, 690 F.2d 670, 674 (8th Cir. 1982).   As to Exhibit 8, the property room voucher establishing the chain of custody for James' firearm, the Court overruled James' authentication objection during the suppression hearing.   To the extent James asks this Court to revisit that conclusion, the Court will treat James' motion as a motion to reconsider.   Because James has not shown a "clear error of law," "newly discovered evidence," "an intervening change in controlling law," or "a need to prevent manifest injustice," his motion to strike [DN 162] is DENIED. *Leisure Caviar, LLC v. U.S. Fish & Wildlife Serv.*, 616 F.3d 612, 615 (6th Cir. 2010) (citation omitted).

James also moves to supplement the record with additional documentary evidence and argument.   [DN 168; DN 172.]   He claims that those documents, [DN 168-2], contradict Browning's statements that James did not have a cell phone at the time of his arrest and that James' vehicle was not towed because of a parking violation.   James' motions to supplement the record [DN 168; DN 172] are GRANTED, and the Court will consider his additional filings in ruling upon James' substantive motions.

(2) *Reasonable Suspicion*

Because Browning and Thompson observed James commit three separate traffic infractions in their presence, Browning's traffic stop of James was justified.

*United States v. Street*, 614 F.3d 228, 232 (6th Cir. 2010).   After initiating the stop, Browning was entitled to ask James to exit his vehicle.   *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977).   However, even when viewing the facts in the light most favorable to the United States, Browning did not have reasonable suspicion under the totality of the circumstances to believe that James was armed, so his *Terry* pat-down search violated James' Fourth Amendment rights.

The Fourth Amendment protects the "right of people to be secure in their persons . . . against unreasonable seizures." U.S. Const. amend. IV.   "[It] protects people, not places, and provides sanctuary for citizens wherever they have a legitimate expectation of privacy."   *Minnesota v. Olson*, 495 U.S. 91, 96 n.5 (1990) (citation omitted).   "The Fourth Amendment requires that searches and seizures be reasonable."   *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000).   "A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing."   *Id.* (listing exceptions).   "After detaining a person . . . , [an] officer may conduct a 'reasonable search for weapons . . . where he has reason to believe that he is dealing with an armed and dangerous individual.'"   *United States v. Pearce,* 531 F.3d 374, 380 (6th Cir. 2008) (quoting *Terry v. Ohio,* 392 U.S. 1 at 27 (1968)).   "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."   *Terry,* 392 U.S. at 27.   When evidence is obtained as a result of an unconstitutional search or seizure, it is inadmissible in federal court.   *Pearce,* 531 F.3d at 381 (citing *Mapp v.*

*Ohio,* 367 U.S. 643, 654 (1961)).   "This exclusionary rule is supplemented by the 'fruit of the poisonous tree' doctrine, which bars the admissibility of evidence which police derivatively obtain from an unconstitutional search or seizure." *Id.* (citations omitted).

When courts evaluate the reasonableness of a *Terry* stop, courts engage in a two-part analysis. *United States v. Mays*, 643 F.3d 537, 541 (6th Cir. 2011) (citation omitted).   First, the court must "ask whether there was a proper basis for the stop." *Id.* (quoting *United States v. Smith*, 594 F.3d 530, 536 (6th Cir. 2010)). If the stop was proper, the court must then "determine whether the degree of intrusion . . . was reasonably related in scope to the situation at hand." *Id.* at 542. In this case, Browning and Thompson had a proper basis for stopping James' vehicle.   "When law enforcement officers witness a traffic violation, they may stop the driver and his car." *United States v. Street*, 614 F.3d 228, 232 (6th Cir. 2010); *see also Whren v. United States*, 517 U.S. 806, 810 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.").   Here, Browning witnessed at least three separate infractions that justified his stop of James.   He first observed James driving without wearing a seatbelt, in violation of KRS 189.125(6).   This alone justified the stop, regardless of whether a seatbelt violation is an arrestable offense. *See Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977) (approving of stop to issue traffic summons for expired license plate).   Browning then saw James make two right turns without using his turn signal, in violation of KRS 189.380(2).   During

10

his evidentiary hearing, James did not contest that he was not wearing a seatbelt, or that he failed to signal before turning onto 19th Street and Madison Street. Thus, the officers' traffic stop of James was reasonable.

Next, Browning was justified in asking James to exit his vehicle.  "In the course of a stop premised on a traffic violation, police may instruct the driver or occupant to exit the vehicle." *Street*, 614 F.3d at 232 (citing *Mimms*, 434 U.S. at 111).  This rule is grounded in the need to ensure officer safety.  The Supreme Court "has recognized that traffic stops are 'especially fraught with danger to police officers.'"  *Arizona v. Johnson*, 555 U.S. 323, 330 (2009) (quoting *Michigan v. Long*, 463 U.S. 1032, 1047 (1983)).  Therefore, "the Fourth Amendment permits officers to conduct an otherwise-legitimate stop on their own terms—whether by keeping the driver (and occupants) in the car or by asking them to exit the car, depending on what they perceive as safer."  *Street*, 614 F.3d at 232 (citing *Maryland v. Wilson*, 519 U.S. 408, 415 (1997); *Mimms*, 434 U.S. at 111).  As Browning correctly explained to James during their encounter, Browning was entitled to ask James to get out of his vehicle during the course of the stop.

The gravamen of James' motion to suppress, then, is ultimately whether Browning had reasonable suspicion to believe James was armed and dangerous, thereby justifying his limited search of James' person.  *Terry v. Ohio*, 392 U.S. 1, 27 (1968).  In *Terry*, the Supreme Court held:

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating

> this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.  Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken.

*Id.* at 30-31.  "When discussing how reviewing courts should make reasonable-suspicion determinations, [the Supreme Court] ha[s] said repeatedly that they must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citation omitted).  The "totality of the circumstances approach allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Martin*, 289 F.3d 392, 398 (6th Cir. 2002).  Courts engage in an individualized analysis with respect to the facts of each case, *United States v. Garrido*, 467 F.3d 971, 982 (6th Cir. 2006) (collecting cases), and "officers must be able to articulate more than an inchoate and unparticularized suspicion or hunch," *United States v. Mays*, 643 F.3d 537, 542 (6th Cir. 2011) (citations omitted).

In its response to James' motion, the United States points to five facts that it contends constituted reasonable suspicion to believe James was armed:

> 1) An LMPD Detective observed James committing two traffic violations while passing through an alley in the Russell neighborhood of West Louisville, a High Crime Area;

12

2) Upon being asked for his operator's license, James leaned forward and made a hurried grab in the direction of his right rear pants pocket. Realizing that he had startled the officer, James remarked, "Don't worry, it's only my cellphone";

3) James volunteered to the Officer that he had just been released from prison for a narcotics violation;

4) Upon justifiably being asked to step out of his vehicle, James was observed wearing baggy pants and a baggy t-shirt, which the officer recognized as being consistent with persons who conceal illegal drugs, firearms, and cash;

5) James held an Indiana operator's license and was operating a car with Kentucky plates which he states [sic] was borrowed.

[DN 107 at 4-5.]   These facts more or less align with those established at James' evidentiary hearing.   As explained below, none of these facts viewed in isolation would give rise to reasonable suspicion that James was armed.   And even when they are viewed together, Browning did not have reasonable suspicion justifying a *Terry* pat-down search of James' person.

Three of the factors listed by the United States do support an inference that James was armed.   First and foremost, Browning had affirmative knowledge based upon James' own statements that James had a criminal history involving narcotics. While "criminal history alone is insufficient to give rise to the necessary reasonable suspicion," *United States v. Bentley*, 151 F. App'x 824, 829 (11th Cir. 2005) (citation omitted) (emphasis removed), when a suspect informs an officer that he has recently been released from prison, the officer is allowed to use that fact in the reasonable suspicion calculus, *id*. at 830.   Here, Browning testified that James told him that he had recently been released from prison on narcotics charges.   Browning also

stated that, based upon his law enforcement experience, narcotics traffickers often carry firearms.   It was therefore proper for Browning to take into account James' statements regarding his criminal history.

Similarly, the Supreme Court has recognized that a suspect's presence in a "high crime area," while not dispositive, is a pertinent factor in determining reasonable suspicion.   *Illinois v. Wardlow,* 528 U.S. 119, 124 (2000) (holding stop reasonable when defendant fled upon seeing police in an area known for heavy narcotics trafficking).   Both Detective Browning and Major Thompson testified that, based upon their experience, the Russell neighborhood is known for narcotics trafficking and violent crime.   Browning was entitled to take his knowledge that the Russell neighborhood is a high crime area into account, and Browning testified that he did.   This factor weighs in the government's favor.

The fourth fact listed by the United States, James' baggy clothing, also weighs in the United States' favor, albeit minimally.   Several courts have stated that baggy clothing that could conceal a handgun is a factor police may take into consideration.   *See, e.g., United States v. Brake*, 666 F.3d 800, 805 (5th Cir. 2011); *United States v. Gilliam*, 520 F.3d 844, 848 (8th Cir. 2008).   However, baggy clothing alone is insufficient to give rise to reasonable suspicion that a person is armed.   *See Thomas v. Dillard*, 818 F.3d 864, 900 (9th Cir. 2016) (Bea, J., concurring in part and dissenting in part) (citing *Ybarra v. Illinois*, 444 U.S. 85, 93 (1979)).   Browning observed that James was wearing baggy clothing, and stated that in his experience, baggy clothing is often used to conceal a firearm.

14

The other two facts upon which the United States relies do little to advance its cause.  While courts do sometimes consider a suspect's movements in and around his pockets as a factor in the reasonable suspicion calculus, *see United States v. Paulette*, 457 F.3d 601, 606 (6th Cir. 2006) ("Paulette's insistent movements towards his right pocket"), in this case, James' initial movement towards his right pants pocket could hardly be characterized as suspicious.  He made that move in response to Browning's request for James' identification.  And while James' explanation regarding his conduct was somewhat inconsistent, Browning testified that once James handed over his driver's license, Browning was no longer fearful.  James was asked to produce a driver's license, and that is precisely what he did.

Likewise, the discrepancies created by James' Indiana driver's license do not support the government's argument.  The Court is unaware of any Sixth Circuit case holding that a mismatch between a person's driver's license and the state in which his vehicle is registered gives rise to reasonable suspicion that the person might be armed.  Additionally, James' traffic stop took place in Louisville, Kentucky, just across the Ohio River from Indiana.  An Indiana citizen driving a Kentucky-registered vehicle in Louisville is not altogether unsurprising.

In sum, at the time Browning decided to conduct a *Terry* pat-down of James' outer clothing, he was faced with a suspect that (1) was present in a high-crime area, (2) was, by his own admission, recently released from prison on narcotics charges, and (3) was wearing baggy clothing.  These facts are similar to *United*

States v. Noble, 762 F.3d 509 (6th Cir. 2014), where a divided panel of the court held that officers did not have reasonable suspicion to believe a suspect was armed and dangerous.   In *Noble*, members of a DEA task force stopped a vehicle based upon a traffic violation.   *Id*. at 513.   The task force suspected that the vehicle, a Chevrolet Tahoe, was involved in methamphetamine trafficking.   *Id.*   Noble, a passenger in the vehicle, appeared "very nervous."   *Id.*   An officer "frisked him for weapons on the basis of Noble's nervousness, the fact that the Tahoe was suspected in a DEA investigation, and that [the officer's] training told him that drug traffickers are often armed."   *Id.*   The officer's suspicions were confirmed when the *Terry* pat-down revealed drug paraphernalia and a handgun on Noble's person.   *Id.*   The United States articulated three factors that it argued justified the officer's frisk of Noble: (1) he appeared "extremely nervous," (2) his vehicle was connected to methamphetamine trafficking, and (3) in the officer's experience, suspects involved in narcotics trafficking often carry weapons.   Acknowledging that Noble's case "pose[d] a close question," the Sixth Circuit reversed the district court's denial of Noble's motion to suppress, holding that the government's "three factors [did] not add up to reasonable suspicion."   *Id*. at 522.

Similarly, in James' case, the officers possessed only one reasonable suspicion factor specifically pertaining to James: his statement regarding his criminal history. The other relevant factors, James' presence in a high-crime area and his baggy clothing, could have applied to any number of other persons in the Russell neighborhood on the evening of May 8, 2015.   Upholding Browning's *Terry* pat-

16

down of James upon the minimal justification presented by the United States would, in likely effect, give officers license to frisk a great number of persons in any high-crime area.   Moreover, a contrary decision would discourage members of the public from being forthcoming with police officers regarding their criminal histories.

As the Sixth Circuit recognized in *Noble*, while "traffic stops represent a minor inconvenience to the vehicle's occupants, . . . they are especially fraught with danger to police officers."   *Noble*, 762 F.3d at 521.   But "the Fourth Amendment does not tolerate . . . pat-down searches without some specific and articulable facts to warrant a reasonable officer in the belief that a person was armed and dangerous."   *Bennet v. City of Eastpointe*, 410 F.3d 810, 841 (6th Cir. 2005).   In this case, Browning and Thompson suspected that James might have a weapon in his vehicle, and their beliefs indeed proved true.   However, while officers are given the benefit of the doubt, they are not given the benefit of hindsight.   At the time Browning decided to search James' person, he had only "an inchoate and unparticularized suspicion or hunch" that James was armed.   *United States v. Mays*, 643 F.3d 537, 542 (6th Cir. 2011) (citations omitted).   Therefore, Browning's *Terry* pat-down of James violated the Fourth Amendment.

(3) *Inevitable Discovery*

The Court's inquiry does not end with Browning's unconstitutional search, however.   The United States argues that even if James' Fourth Amendment rights were violated, the firearm Browning seized from James' person would inevitably been discovered because of James' Cook County, Illinois arrest warrant.   Under the

17

doctrine of inevitable discovery, illegally-obtained evidence will not be suppressed if the government proves by a preponderance of the evidence that the evidence "ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984). In James' case, Detective Browning had already obtained James' license with the intent to conduct a warrant check, as was his standard practice. The United States has shown, and James has not rebutted, that James' Cook County, Illinois arrest warrant would have been discovered even if Browning had not conducted a *Terry* pat-down. Because James' handgun would have been revealed in the subsequent search incident to James' arrest on the Cook County warrant, the exclusionary rule does not require it to be suppressed from evidence.

Because "the Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands," *Ariz. v. Evans*, 514 U.S. 1, 10 (1995), not all evidence that is obtained via an unconstitutional search must be suppressed. *United States v. Figueredo-Diaz*, 718 F.3d 568, 573 (6th Cir. 2013). Rather, "the exclusionary rule aims 'to prevent' future violations of the Fourth Amendment [] 'by removing the incentive to disregard it.'" *Id.* (quoting *Elkins v. United States*, 364 U.S. 206, 217 (1960)). When "recovered evidence is the product of illegality, it will be suppressed only where doing so yields deterrence benefits that sufficiently outweigh the substantial social costs associated with exclusion." *Id.* (emphasis removed) (citation omitted).

The Supreme Court has recognized several exceptions to the exclusionary rule, one of which is the doctrine of inevitable discovery. Under that doctrine, "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received." *Nix v. Williams*, 467 U.S. 431, 444 (1984). In the Sixth Circuit, "the inevitable discovery exception to the exclusionary rule applies when the government can demonstrate *either* the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence *or* other compelling facts establishing that the disputed evidence inevitably would have been discovered." *U.S. v. Keszthelyi*, 308 F.3d 557, 574 (6th Cir. 2002) (citation and internal quotation marks omitted). "The government can satisfy its burden by showing that routine procedures that police would have used regardless of the illegal search would have resulted in the discovery of the disputed evidence." *Id.* Finally, when considering whether inevitable discovery applies, "a court must 'determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred.'" *United States v. Mohammed*, 512 F. App'x 583, 587 (6th Cir. 2013) (quoting *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995)) (citation and internal quotation marks omitted).

Here, the government has demonstrated "compelling facts" establishing that the James' weapon would have inevitably been discovered despite Browning's unlawful *Terry* pat-down search. *Keszthelyi*, 308 F.3d at 574. Browning testified

that when he asked for James' driver's license, he did so intending to run a background check using James' information. Importantly, Browning made the decision to run a warrant check on James before he ever removed James from the vehicle or performed the *Terry* pat-down search. Thus, "viewing affairs as they existed at the instant before the unlawful search," *Mohammed*, 512 F. App'x at 587, Browning or one of his supporting officers would have gone ahead with the warrant check, and they would have discovered that James had an active warrant in Cook County, Illinois. Stewart testified that once an NCIC warrant is discovered and verified, officers have no discretion and they must arrest the suspect. Upon James' arrest, he would have been subjected to a search incident to arrest, and the firearm in his right pants pocket would have been discovered. These "routine procedures" would have occurred "regardless of the illegal search [and] would have resulted in the discovery" of James' handgun. *Keszthelyi*, 308 F.3d at 574.

In response to the United States' inevitable discovery argument, James contends that the Cook County arrest warrant was invalid, and it was therefore improper for LMPD to arrest him based upon that warrant. At his second suppression hearing, James introduced several exhibits purporting to show that he had previously been arrested on that same warrant in 2009. James also points out that the government has never produced the actual arrest warrant from Cook County. But by focusing on the warrant's validity, James' arguments miss the mark. The proper inquiry is not whether the Cook County warrant was valid, but whether Browning and Stewart acted in objectively reasonable reliance upon a

warrant they believed to be valid. *See Ariz. v. Evans*, 514 U.S. 1, 15-16 (1995). Here, the officers relied upon the NCIC electronic warrant check system, and had no reason to question its accuracy or validity. Moreover, Stewart testified that the proper procedure for an NCIC warrant required LMPD headquarters to contact NCIC to ensure that the warrant was still valid, and that James was still wanted by the Cook County authorities. LMPD dispatch followed that procedure in this case, and relayed to Stewart that the Cook County warrant was still active. Therefore, this Court "need not consider the validity of the warrant because either way, . . . the officers acted in good faith in executing it." *United States v. Newsome*, 504 F. App'x 463, 465 (6th Cir. 2012).

James' case is similar to *United States v. Umphryes*, No. 08-20573, 2010 WL 1626334 (E.D. Mich. Mar. 19, 2010) (Report & Recommendation), *adopted on other grounds*, 2010 WL 1626200 (E.D. Mich. Apr. 21, 2010). There, the police stopped the vehicle in which the defendant was riding for minor traffic infractions. *Id.* at *1. After observing the defendant make several suspicious gestures, officers performed a *Terry* pat-down and discovered that the defendant had a weapon in his coat pocket. *Id.* at *2. After placing the defendant in custody, the officers discovered that he had outstanding warrants for his arrest. *Id.* The magistrate judge ultimately concluded that the officers had reasonable suspicion to search the defendant for weapons, but even if they had not, they would have inevitably discovered the defendant's outstanding warrants. *Id.* at *5. Therefore, his firearm would have been discovered during a search incident to arrest. *Id. See*

*also United States v. Bates*, 750 F. Supp. 2d 342, 353 (D. Mass. 2010) (firearm in defendant's backpack would have inevitably been discovered during search incident to arrest when computer system indicated to officers that defendant had outstanding warrants).

Ultimately, James' case falls into the narrow category of cases in which an unconstitutional search occurred, but suppression is not warranted.   Although Detective Browning may have suspected that James was carrying a weapon, and that suspicion proved true, the Fourth Amendment requires more.   Browning, like all the witnesses presented by the United States, testified credibly and did not embellish the facts of James' traffic stop, search, and arrest.   But even construing the facts in the government's favor, Browning did not have reasonable suspicion to believe that James was armed and dangerous at the time of the *Terry* pat-down search.   Nevertheless, the United States has proven by a preponderance of the evidence that James would have been arrested pursuant to the Cook County, Illinois arrest warrant that Detective Stewart discovered in the NCIC database. James' firearm, in turn, would inevitably been discovered in a subsequent search incident to arrest.   Therefore, the exclusionary rule does not require suppression of James' handgun.   His motion to suppress [DN 105] is accordingly DENIED.

### B. James' Motions to Exclude Evidence

James has also moved to exclude as evidence firearms bearing the serial numbers DNX903 and DNX930, respectively.  [DN 102; DN 103.]  The United States has responded to both motions, [DN 109], and James has replied, [DN 115].

With respect to James' second motion, [DN 103], the United States says that it will not introduce the uniform citation that contains a reference to a handgun bearing the serial number "DNX930," and will not introduce any weapon bearing that serial number at trial.   [DN 109 at 2.]   Therefore, James' second motion [DN 103] is DENIED AS MOOT.

As to James' first motion, [DN 102], he seeks to "exclude Glock 23 .40 caliber pistol, serial number DNX903 U.S., as evidence on grounds of authentication or irrelevancy," citing Federal Rules of Evidence 104(a) and (b), 901(a), and 403, as well as *Siegal v. American Honda Motor Co., Inc.*, 921 F.2d 15 (1st Cir. 1990).   [DN 1 at 1.]   James states in his motion that CSU technician Stephenson "by written admission delineated that aforesaid seized Glock 23 .40 caliber pistol, SN: DNX903 U.S., is property owned by the Commonwealth of Kentucky Society and was not found in James' possession at the time of his arrest on May 8, 2015."   [*Id.*]

Federal Rule of Evidence 901(a) provides, "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."   It is the court's duty to "decide any preliminary question about whether . . . evidence is admissible."   Fed. R. Evid. 104(a).   "When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist."   *Id.* § 104(b).   Finally, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice."   *Id.* § 403.

James' motion to exclude the DNX903 handgun traces back to Detective Browning's initial mistake in filling out James' uniform citation. At the evidentiary hearing, Browning testified that he inadvertently transposed the last two digits of the firearm's serial number, and that he is now aware that the weapon he seized from James bears the serial number DNX903. Stephenson listed the correct serial number on her CSU documentation, and the firearm itself was introduced into evidence. After hearing the testimony and reviewing the documentary evidence of record, the Court is satisfied that what amounts to a mere scrivener's error should not prevent the United States from introducing the DNX903 firearm at trial.

James' situation is readily distinguishable from *Siegal v. American Honda Motor Co., Inc.*, the case he cites in support of his motion. In *Siegal*, the plaintiff's husband was killed in a motorcycle accident, and shortly thereafter, Honda issued a recall for the motorcycle's handlebar assembly. 921 F.2d at 15. A year after the accident, experts hired by both parties jointly examined the decedent's motorcycle and found no defect in the handlebar assembly. *Id.* at 16. Three years later, a second inspection was performed, and "Honda discovered that the handlebar assembly was loose, corroded, and gouged with tool marks." *Id.* The motorcycle had been stored at the plaintiff's residence during the entire pendency of the suit. *Id.* The First Circuit held that the district court properly excluded the motorcycle from evidence under Federal Rules of Evidence 402, 403, and 901(a) because of the evidence that the motorcycle had been intentionally tampered with. *Id.* at 18.

Here, unlike the defendant in *Siegal*, James presents no evidence suggesting that the United States has intentionally tampered with or altered the Glock 23 .40 caliber handgun, serial number DNX903. Rather, James' case is more aptly compared with *United States v. Winston*, No. 13-CR-20394, 2014 WL 234480 (E.D. Mich. Jan. 22, 2014). There, the defendant was indicted for, among other things, being a felon in possession of a firearm. *Id.* at *1. His indictment stated that he was found in possession of "a Smith and Wesson .32 caliber handgun . . . bearing serial number 54342." *Id.* at *2. However, during discovery, the defendant received a police report stating that the weapon seized from his person bore the serial number 521933. The government explained this discrepancy, stating that the arresting officer had initially recorded a number from a different part of the firearm. *Id.* at *3. The court declined to dismiss the indictment or suppress the firearm based upon this technical mistake. *Id.* at *3-4.

Likewise, Browning's initial transposition of the serial number's terminal digits does not prevent the United States from authenticating the DNX903 firearm at trial. At this stage of James' case, the government has established, and James has not rebutted, a valid chain of custody for the weapon. Moreover, James has not shown how the serial number discrepancy has prejudiced him in any way. Browning's unintentional mistake should therefore not provide James with what would amount to a get-out-of-jail-free card in this case. James' motion to exclude [DN 102] is therefore DENIED.

### III. Conclusion

For the foregoing reasons, IT IS HEREBY ORDERED:

Defendant Kenyatta James' motions to suppress and exclude evidence [DN 102; DN 103; DN 105] are DENIED;

Defendant's motion to strike [DN 162] is DENIED; and

Defendant's motions to supplement the record [DN 168; DN 172] are GRANTED.

CC: Counsel of Record
Kenyatta James, *pro se*